**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

JAMES J. DUNN,

                              Plaintiff,

     v.                                               No. 98-CV-693
                                                        (LEK/DRH)

GARY SCHULTZ, Investigator, New York State
Police,

                              Defendant.[1]

---

**APPEARANCES:**                             **OF COUNSEL:**

JAMES J. DUNN
Plaintiff Pro Se
96-B-1034
Oneida Correctional Facility
Post Office Box 4580
Rome, New York 13442-4580

HON. ANDREW M. CUOMO                ADELE M. TAYLOR-SCOTT, ESQ.
Attorney General for the                      Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER
U.S. MAGISTRATE JUDGE**

---

[1] This action has been pending for over twelve years. It has twice been terminated in the district court and twice appealed to the Second Circuit Court of Appeals. See Dkt. Nos. 63, 72, 101, 105, 109, 113, 124. The most recent decision of the Second Circuit permitted Dunn to file an amended complaint naming Schultz as a defendant and Dunn filed such a complaint. See Dkt. No.129. Schultz is now the only defendant remaining in the action. Id. Dunn initially commenced this action on April 29, 1998 for events that occurred prior to his conviction and incarceration for arson and burglary. Compl. (Dkt. No. 1) 4(b)-(c); see also Dunn Dep. (Dkt. No. 135-3) at 40, 43-47 (discussing Dunn's guilty pleas); Dkt. No. 135-3 at 189-90. Other defendants were previously dismissed from the action. Dkt. Nos. 63, 72. While the amended complaint filed April 27, 2009 named only Schultz as a defendant, the docket continues to list William E. Carrier and Margaret Carrier as defendants. The Clerk shall amend the docket to reflect that the Carriers have been terminated from the action by virtue of the amended complaint.

**REPORT-RECOMMENDATION AND ORDER**[2]

Plaintiff pro se James J. Dunn ("Dunn"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Gary Schultz, a New York State Police Investigator ("Schultz"), violated Dunn's Eighth and Fourteenth Amendment rights.[3]  Am. Compl. (Dkt. No. 129).  Presently pending is Schultz's motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 135.  Dunn opposes the motion.  Docket No. 136.  For the following reasons, it is recommended that Schultz's motion be granted.

**I. Background**

The facts are related herein in the light most favorable to Dunn as the non-moving party.  See subsection II(A) infra.  The events in question occurred prior to Dunn's conviction and incarceration.

On May 17, 1995, Schultz was assigned to protective duty at the Carrier residence.  Schultz Decl. (Dkt. No. 135-2) ¶¶1, 3-5; Carrier Dep. (Dkt No. 135-3 at 185-87) at 185.  Schultz was informed by another inspector and his superior officer that an indictment was about to be secured against Dunn in an arson case, one or both of the Carriers had testified

---

[2]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[3] The Eighth Amendment protections apply to those who have been convicted of a crime, sentenced, and are thus suffering the "punishment" contemplated by the Cruel and Unusual Punishment Clause.  Benjamin v. Fraser, 343 F.3d 35, 49-50 (2d Cir. 2003) (citing cases).  Dunn had not yet been convicted and, therefore, the Eighth Amendment does not apply to his excessive force claims.  Rather, Dunn's claims will be considered under the Fourth Amendment.  See, Graham v. Connor, 490 U.S. 386, 395 (1989).

against Dunn before the grand jury, and Dunn had threatened that he would set the Carriers' house on fire. Schultz Decl. ¶¶ 6-7; see also Carrier Dep. at 185 (explaining that after testifying Mr. Carrier was concerned for his safety so a police presence remained with him at his residence after the court proceedings). Schultz was told that "Dunn was a former police officer, that he was dangerous, that he could be armed, and that he most likely would be carrying a hand grenade or other incendiary device." Schultz Decl. ¶ 8.

Schultz was the only officer assigned to the Carrier residence on May 17. Schultz Decl. ¶ 9. When he arrived at the residence, Schultz secured the doors and windows, but, his efforts were undermined by the Carriers' son who continued to enter and exit the house without locking the doors behind him. Schultz Decl. ¶¶ 10, 12. Schultz believed the doors were locked when someone walked into the living room, unannounced, and was identified by Mr. Carrier as Dunn. Schultz Decl. ¶ 11; Dunn Dep. (Dkt. No. 135-3 at 28-146)[4] at 27, 71-75; Carrier Dep. at 186.

Prior to the date in question, Dunn had been suffering from health problems related to his uncontrolled diabetes and knee. Dunn Dep. at 15. From January to May of 1995, Dunn was extremely weak, losing weight and considerable muscle mass and strength, and having difficulty ambulating. Id. at 16-18. The condition also resulted in pain in his back and leg, allowing him to be able to drive for only thirty minutes at a time before having to exit the car to change positions. Id. at 17, 29. Additionally, Dunn underwent arthroscopic surgery on his knee on April 25, 1995 to relieve pain resulting from a partially torn meniscus and

---

[4] All page numbers for Dunn's deposition refer to the transcript pages. Prior reference to the page numbers within Dkt. No. 135-3 were solely for reference purposes to assist the reader in finding where the deposition transcript was located within the document.

calcium build-up in the joint. Id. at 19-23; see also Dkt. No. 135-3 at 152-53 (concluding that due to Dunn's "persistent problems and his failure to improve," arthroscopic surgery on his knee was required); Dkt. No. 135-3 at 157-58, 168-69 (notes from surgical procedure); Dkt No. 135-3 at 159-60, 163, 166, 174.  Following the operation, Dunn stated that his knee was sore, he took pain medication, and he was required to use crutches.  Dunn Dep. at 23.  However, on the date of the incident, Dunn was no longer using crutches to walk short distances and, thus, was not using crutches when he entered the Carrier residence and was detained by Schultz.  Dunn Dep. at 68, 79.

Schultz claims to have immediately identified himself as a police officer, before grabbing Dunn by his wrist and escorting him into the hallway.  Schultz Decl. ¶ 15; see also Carrier Dep. at 186 (affirming that Schultz identified himself and then frisked Dunn).  Dunn contends that Schultz repeatedly refused to identify himself and immediately grabbed Dunn by his arm and neck.  Dunn Dep. at 75-78, 93; Dkt. No. 136 at 4, ¶¶ 20, 25.  Once in the hallway, Schultz states that he placed Dunn against the wall despite Dunn's minimal resistance and secured his wrists with handcuffs.  Schultz Decl. ¶ 16.  Dunn contends that handcuffs were never applied and, instead, Schultz searched him with his left hand and continued to hold and twist his wrist with Schultz's right hand.  Dunn Dep. at 79; Dkt. No. 136 at 5, ¶¶ 31-32.  Once Dunn was up against the wall, Schultz used his foot to spread Dunn's legs apart, "to place [Dunn] off-balance and impede his ability to retaliate while [Schultz] patted him down and checked for weapons or any incendiary devices."  Schultz Decl. ¶ 17.  Schultz described the procedure as standard and one that he had employed hundreds of times throughout his career without incident.  Schultz Decl. ¶ 18.  As Dunn was put on the wall and his legs spread, he contends that he told Schultz to be careful

4

because he just had stitches removed from a previous operation. Dunn Dep. at 77; Dkt. No. 136 at 4, ¶ 25. Schultz and Carrier claim to have never heard Dunn mention anything about having surgery or stitches. Schultz Decl. ¶ 20; Carrier Dep. at 186. When Schultz finished the search and did not find any weapons, he escorted Dunn out the front door. Schultz Decl. ¶ 19.

As the two exited the premises, Schultz felt that Dunn was again presenting minor resistance by pulling away, stopping along the sidewalk, refusing to walk, and attempting to return to the residence to speak with William Carrier. Schultz Decl. ¶ 21. According to Schultz, about ten steps from the front door, Dunn then went limp in "an attempt to interfere with and further impede [Dunn's] removal from the residence." Id. ¶ 22. Dunn contends that he was neither fighting nor resisting but could barely stand. Dunn Dep. at 80-81. Schultz supported Dunn's body weight and, when they reached the foot of the steps in front of the Carrier residence, Schultz sat Dunn down on the landing. Schultz Decl. ¶¶ 23-24. Dunn contends that he was thrown on the steps and ground, landing hard on his lower back and ceasing all movement. Dunn Dep. at 82. At this point, approximately three minutes time had passed between when Dunn entered the living room until the time he was seated on the landing. Schultz Decl. ¶ 38; Dunn Dep. at 83.

After being seated, Dunn stated that he had previously undergone surgery, but Schultz found the statements to be "overly dramatic." Schultz Decl. ¶ 26. Schultz then called his superior to inform him that Dunn had appeared at the Carrier residence, "the situation was secure, and requested orders on how to proceed." Id. ¶ 28. Carrier informed Schultz, while on the phone, that he had not advised Dunn to stay away from his home, and Schultz was "advised [by his supervisor] that once [he] had removed [Dunn] from the residence, [he] had

5

no further basis to detain him, because an indictment . . . had not yet been handed down, and . . . Mr. Carrier [ha]d not earlier t[old him] not to come to the house . . . .," so Dunn was not technically trespassing. Id. ¶ 30. Schultz was told to release Dunn and escort him off the property. Id. ¶ 30.

According to Schultz, Dunn then rose to his feet without assistance, had the handcuffs removed, and walked to his car on his own accord without any signs of incapacity. Schultz Decl. ¶¶ 31-33. Dunn alleges that Schultz escorted him to his vehicle by grabbing onto his arm and neck again, threw him onto the hood of the car, and advised him not to return. Dunn Dep. at 83-87, 93-94; Dkt. No. 136 at 5, ¶ 33. Schultz advised Dunn that if he returned to the residence, he would be arrested. Schultz Decl. ¶ 35; Dunn Dep. at 85, 93-94; Carrier Dep. at 186. Dunn estimates that from the time he sat on the step until he reached his vehicle, another three minutes had passed. Dunn Dep. at 85. There are no allegations that Schultz ever hit or struck Dunn during the incident. Id. at 87-88; see also Carrier Dep. at 186 ("Inv. Schultz never pushed or hit . . . Dunn or hurt him in any way. He only frisked him while in the living room.").

The following day, Dunn sought medical attention for his knee and back. Dunn Dep. at 94-95. Dunn continued to receive medical treatment from his physicians throughout his incarceration, and within five months of his knee surgery, was told that "everything look[ed] good . . . ." Id. at 95. Dunn also testified that, although his knee was "worse for a while", it is now fine. Id. at 98; but see Dkt. No. 136 at 7, ¶ 38 (claiming that "after the assault . . . [Dunn] had to use crutches to walk for ten years."). Additionally, Dunn's physician indicated that time would heal his knee, there was no further injury indicated, and there was no need for additional surgery. Dunn Dep. at 98-100.

Dunn claimed that his main injuries from the incident were to his back and shoulder, specifically stating that he developed "a mark right across [his] back spine area and lower back," from the stairs. Dunn Dep. at 95-96. The medical evaluation noted sensitive spots, radiological tests were taken, but Dunn was ultimately released. Dunn Dep. at 96; see also Dkt. No. 135-3 at 177 (findings of lumbar spine MRI scan in response to leg and back pain finding some narrowing of the disc space and "minimal spinal stenosis"). Dunn testified that he never had any previous back trouble, but that now he experiences considerable, pain intermittently and requires crutches to walk. Dunn Dep. at 100-03, 108. Dunn has received pain medication to alleviate his symptoms. Id. at 103-04. Dunn also agreed that the majority of his leg pain and weakness was caused and exacerbated by his uncontrolled diabetes. Id. at 104-06.

On June 30, 1995, it was noted that Dunn's back pain was intermittent, his right knee had improved from the arthroscopic surgery, and he could rise from a sitting position with difficulty yet ambulate with little support once he was standing. Dkt. No. 135-3 at 179-80. The examining physician found that Dunn's physical weakness was due to his uncontrolled diabetes and that "[h]e may recover strength over time with regained control of his diabetes." Id. at 180. A physical therapy consult was recommended, and completed on August 10, 1995. Id. at 180-81. The physical therapist noted Dunn's lower extremity weakness, but also commented on how Dunn could transfer himself in and out of a chair, onto the treatment table, and from the bed. Id. at 181. The therapist concluded that Dunn required strengthening exercises and noted that "there may be some symptom magnification [from] . . . some inconsistencies in his motor performance . . . This does not negate the obvious atrophy and weakness but may be evidence of some exaggeration of

7

pain and disability." Id. at 182.

## II.  Discussion

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d

185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

### B.  Fourth Amendment

"[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . . "  Graham v. Connor, 490 U.S. 386, 395 (1989) (internal quotation marks omitted); see also Papineau v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006) ("The Fourth Amendment protects individuals from the government's use of excessive force when detaining or arresting individuals . . . [C]ourts should examine whether the use of force is objectively reasonable . . . ." when determining Fourth Amendment claims).  Determining whether the force was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest . . . ."  Graham, 490 U.S. at 396.  This particular "inquiry does not allow us to substitute our own viewpoint: we must judge the officer's actions from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Papineau, 465 F.3d at 61 (citing Graham, 490 U.S. at 396); see also Nimely v. City of New York, 414 F.3d 381, 390 (2d Cir. 2005) ("[T]he reasonableness of the officer's decision . . . depends

only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ . . . force.") (internal quotation marks and citations omitted).  This standard recognizes "the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving . . . . " Graham, 490 U.S. at 396-97.

"[I]f during the course of a lawful investigatory detention the officer reasonably believes that the detained individual might be armed and dangerous," the police officer is permitted to pat the individual down to search for weapons.  Holeman v. City of London, 425 F.3d 184, 191 (2d Cir. 2005) (citing inter alia Terry v. Ohio, 392 U.S. 1, 27 (1968) ("[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest [him] . . . .")). Making such a "stop necessarily carries with it the right to use some degree of physical coercion or threat . . . ." Graham, 490 U.S. at 396 (citations omitted).  The question is whether that degree of force is reasonable, which is an "inquiry that must be undertaken without regard to the underlying motives or intent of the police officers." Martin v. Tatro, No. 04-CV-800, 2005 WL 2489905, at *10 (N.D.N.Y. Oct. 7, 2005) (citations omitted).  It is also important to note that "[i]f a plaintiff sustains an injury during an arrest, this is a relevant factor for the court in considering whether the force used was reasonable.  However, reasonable force does not become unconstitutional merely because it caused plaintiff serious injury." Id. (citations omitted).

In this case, it is undisputed that Dunn was appropriately stopped based upon Schultz's reasonable belief that he was armed and dangerous based upon the information Schultz

10

had received from his superior officers and the Carriers. Thus, the only question that remains is whether, viewing the evidence in the light most favorable to Dunn, Schultz's actions in the approximately six minutes that he detained and searched Dunn were reasonable given the facts and circumstances which were apparent to Schultz at the time.

Schultz's actions in either handcuffing or restraining Dunn upon his entrance into the home were reasonable even when the evidence is viewed in the light most favorable to Dunn.[5] First, Dunn was accused of multiple counts of arson and burglary, both serious crimes. Schultz Decl. ¶¶ 6-7; Carrier Dep. at 185. Additionally, Dunn had threatened William Carrier for testifying in conjunction with these charges, a fact not disputed by Dunn in any of his papers. Schultz Decl. ¶¶ 6-7; Carrier Dep. at 185. Thus, the threat to the Carriers to burn down their home using a grenade or incendiary device in conjunction with a pending arson investigation indicated to Schultz a reasonably severe threat. Schultz Decl. ¶ 8. Prior to searching Dunn, Schultz had no idea whether he had made true on his threats, so there was a reasonable belief that both Schultz and the Carriers were in grave danger. Accordingly, Schultz's actions in placing Dunn on the wall, spreading his legs, and searching him, were, objectively reasonable given the undisputed known facts at the time.

Furthermore, the amount of force employed to restrain Dunn, place him against the wall, and spread his legs was neither unconscionable nor unreasonable given the perceived threat. Whether or not Dunn stated that he had previously had surgery would not change Schultz's state of mind given Dunn's dangerousness and the necessity to perform a search

---

[5] To the extent Dunn alleges that Schultz was verbally abusive to him during the incident, such contentions are insufficient to establish a basis for relief. Allegations of verbal harassment alone are not actionable under § 1983. See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1996) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed.").

11

to ensure the safety of both Schultz and the Carriers.  Furthermore, no facts were evident to cue Schultz that Dunn was suffering from ambulatory problems as Dunn entered the house on his own accord, without assistive devices, and did not display difficulties until he was escorted from the house.  Dunn Dep. at 68, 79-81.  Therefore, it was reasonable for Schultz to believe that Dunn was not in a physically compromised state such that spreading his legs would result in injury.

Additionally, Schultz's continued physical restraint of Dunn out of the house was reasonable given Dunn's undisputed conduct in failing to walk, which Schultz reasonably interpreted as resistance.  Schultz Decl. ¶¶21-22; Dunn Dep. at 80-81.  Schultz's belief that Dunn was being uncooperative was reasonable given that he was completely unaware that Dunn had a history of uncontrolled diabetes which resulted in extreme muscle weakness and an inability at times to ambulate normally.  Dunn Dep. at 16-18.  Moreover, Schultz's placement of Dunn onto the steps for a few minutes were also completely reasonable.

Furthermore, any contentions of serious injury suffered by Dunn at the hands of Schultz are insufficient to establish excessive force.  First, even viewing the facts in the light most favorable to Dunn, there are no facts sufficient to support the finding of a serious injury.  Schultz's actions in spreading Dunn's legs to facilitate a search for weapons was, as previously discussed, reasonable.  Moreover, the action of separating his legs was not overly aggressive.  It also did not result in any appreciable injury as both Dunn and his physicians have noted that within a few months Dunn's knee was completely healed and he did not require any further surgery.  Dunn Dep. at 95, 98-100.  Moreover, Schultz's actions of putting Dunn onto the steps, resulting in a mark on his back, is also insufficient to establish a serious injury.  Dunn Dep. at 95-96.  Dunn's own testimony indicates that his

back pain was intermittent, and had been so for sometime prior to the alleged incident. Dunn Dep. at 17, 29; Dkt. No. 135-3 at 179-80  Much of his lower body pain and instability was a result of his uncontrolled diabetes.  Dunn Dep. at 104-06; Dkt. No. 135-3 at 180. Even if such subsequent injuries could be classified as serious, it does not automatically mean that Schultz used excessive force.  Martin, 2005 WL 2489905, at *10.  For the reasons discussed above, Schultz's actions in spreading Dunn's legs to search him and setting him down when he became unable to walk were both reasonable given the situation.

Accordingly, Schultz's motion on this ground should be granted.

### C. Qualified Immunity

Defendant claims that even if Dunn's constitutional claims are substantiated, he is entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  With regard to excessive force claims, the Second Circuit has discussed in detail the various considerations for finding qualified immunity.

13

> The inquiry is whether the alleged use of excessive force was objectively reasonable. Thus, claims that an officer made a reasonable mistake of fact that justified the use of force are considered at this stage of the analysis. If the plaintiff fails to establish a constitutional violation, the qualified immunity inquiry ends and the plaintiff may not recover. If, however, a constitutional violation can be shown, the court must then determine whether the constitutional right was clearly established at the time of the constitutional violation. This inquiry focuses on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." . . . This inquiry adds a "further dimension" to the qualified immunity analysis by acknowledging that "reasonable mistakes can be made as to the legal constraints on particular police conduct." And it ensures that "all but the plainly incompetent or those who knowingly violate the law" are protected from suit.

Cowan v. Breen, 352 F.3d 756, 761 (2d Cir. 2003) (citations omitted).

Here, even assuming that Dunn suffered injuries caused by Schultz and that the use of force causing such injuries was unreasonable, Schultz is entitled to qualified immunity. Any reasonable officer in Schultz's position, providing protective custody to a witness and being confronted with the individual who made the threats, would have engaged in a temporary detention, search, and call for further instructions to his or her superior officer in a similar situation. It would not have been clear to a reasonable officer that instituting such a search by spreading Dunn's legs, and placing him onto the stoop while awaiting further instruction would have been unlawful in this situation.

Accordingly, in the alternative, defendant's motion on this ground should be granted.

### D. Eleventh Amendment

Dunn names Schultz in both his individual and official capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed

14

to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

   A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir.1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Here, Dunn seeks monetary damages against Schultz in his official capacity for acts occurring within the scope of his duties with the Sew York State Police. Thus, the Eleventh Amendment bar applies and serves to prohibit Dunn's claim for monetary damages against Schultz in his official capacity.

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Schultz's motion for summary judgment (Dkt. No. 135) be **GRANTED** and that judgment be entered in favor of Schultz as to all remaining claims in the amended complaint (Dkt. No. 129).

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 11, 2010
       Albany, New York

_David R. Homer_
United States Magistrate Judge